## UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF VIRGINIA
### Alexandria Division

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| GLOBAL COMPUTER ENTERPRISES, INC., | ) | Case No. 14-13290-BFK |
| | ) | Chapter 11 |
| Debtor. | ) | |
| | | |
| GLOBAL COMPUTER ENTERPRISES, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Adversary Proceeding |
| | ) | No. 15-01063-BFK |
| STEESE, EVANS & FRANKEL, P.C., | ) | |
| | ) | |
| Defendant. | ) | |

### MEMORANDUM OPINION

This adversary proceeding came before the Court for a trial on the merits on May 15-25

and June 8, 2017. For the reasons stated below, the Court will grant judgment to the Defendant

on the sole remaining Count in the Plaintiff's Second Amended Complaint, Count III (Legal

Malpractice).[1]

### Findings of Fact

The Court, having heard the evidence, makes the following findings of fact:

1.      Global Computer Enterprises, Inc. ("GCE") was a closely held government

contracting firm with its offices in Reston, Virginia. GCE's core business focused on cloud-

based financial management systems.

---

[1] The Plaintiff's Second Amended Complaint is found at Docket No. 97. The Court granted the Defendant's Motion for Judgment on Partial Findings pursuant to Bankruptcy Rule 7052 (incorporating Fed. R. Civ. Pro. 52(c)) on Counts I (Objection to Claim) and II (Recovery/Turnover of Money), at the conclusion of the Plaintiff's case. Docket No. 315. The Court previously dismissed Count IV (Breach of Fiduciary Duty) with prejudice. Docket No. 129.

2.      Steese Evans & Frankel, P.C. ("SEF") was a law firm in the District of Columbia. SEF acted as counsel to GCE for a number of years prior to the events that gave rise to this lawsuit.

A.  *The Nature of GCE's Business.*

3.      Raed (Ray) Muslimani is GCE's Chief Executive Officer (CEO) and 100% shareholder. He earned a master's degree in computer science. He formed GCE in 1998 or 1999, after spending approximately 10 years at Computer Sciences Corporation, first as a software engineer and later as a technical director for financial systems with such clients as the U.S. Army.

4.      Initially, GCE held contracts with the U.S. Coast Guard, where Mr. Muslimani had contacts. He later formed a relationship with the U.S. General Services Administration ("GSA").

5.      Mr. Muslimani led GCE to implement financial management systems involving shared services providers ("SSP") using the Cloud.

6.      In 2008, GCE obtained a large contract with the U.S. Department of Labor ("DoL") for financial systems involving the SSP. In this arrangement, GCE retained ownership of the software and charged the government a flat fee per month for its use. Later, GCE entered into the same kind of contracting arrangement with the Equal Employment Opportunity Commission ("EEOC").

7.      GCE developed into a business with more than 100 employees and approximately $20 million per year in gross revenues. GCE obtained certain certifications such as CMMI Level

3 and EVM, which enabled it to bid on more complex contracts with the government. Pl. Ex. III-133, 136.[2]

8.      In early 2013, GCE had 140 to 150 employees. The company projected annual gross revenue of approximately $21 million.

*B.  GCE and SEF's Early Relationship.*

9.      Jonathan Frankel is an attorney licensed to practice in the District of Columbia. He met Mr. Muslimani when he was with the law firm of Wilmer Hale. Mr. Frankel successfully represented GCE in a bid protest with the U.S. Coast Guard and in another bid protest with the U.S. Department of Homeland Security ("DHS").

10.      Eventually, Mr. Frankel became a trusted advisor and go-to lawyer for GCE on corporate matters, though GCE continued to use other law firms for advice on matters such as immigration and the corporate spinoff of Serendipity discussed below.

11.      In 2009, Mr. Frankel decided that he could establish a market niche using lower hourly rates than he was able to charge at Wilmer Hale and decided to strike out on his own. To this end, he formed a partnership with Kevin Evans and Charles Steese to form SEF. Mr. Evans and Mr. Steese practiced law in Denver.

*C.  SEF's Advice on ReThink.*

12.      In April 2011, GSA awarded GCE a contract for software development for the System for Award Management (SAM) (the "SAM Task Order"). The contract contained a Place of Performance provision, which required:

> 8.0 Place of Performance
> Software development may take place on the SAM development servers or on the successful offeror's workstations at their own facility within the United States of

---

[2] The Plaintiff's Exhibits are referred to in this Opinion as "Pl. Ex. __." The Defendant's Exhibits are referred to as "Def. Ex. __." Because the Plaintiff's Exhibits are re-numbered in five separate exhibit binders (that is, each binder starts with the number "1"), the roman numerals I – V designate the exhibit binder in which that exhibit is located.

America. If developing outside the SAM development environment, the successful offeror must update the SAM development server on a daily basis and within 2 hours when requested by the IAE PMO or the AOCS Contractor on behalf of the IAE PMO. Meetings may take place throughout the Washington, DC, metropolitan region. On-line meetings, webinars and teleconferences may be used in lieu of face-to-face meetings with remote locations.

Pl. Ex. I-1, p. 3.

13.     GCE submitted an ORCA – an online representation and certification – dated February 23, 2011, to the government, in which GCE certified that it would abide by the place of performance provision in the SAM Task Order. Def. Ex. EE.

14.     In addition, GCE submitted at least one Monthly Project Status Report (Reporting Period: October 22, 2011 – November 21, 2011), dated December 20, 2011, on the SAM Task Order in which it certified: "GCE developed all software at our development center in Reston, VA." Pl. Ex. II-123, p. 2 (SEF 0332891).

15.     In August 2011, Venkatesh Kalluru, GCE's project manager on the SAM Task Order, requested advice from John Janacek, an attorney in SEF's D.C. office, on whether GCE could use personnel with a related firm located in India called ReThink India ("ReThink") for certain work on the SAM contract. Pl. Ex. I-1. Mr. Janacek is a highly experienced attorney in the field of government contracts. He spent approximately eight years with the Defense Supply Agency, and twenty-two years with the Air Force's Office of General Counsel, where he served as Deputy General Counsel. He worked with Mr. Frankel at Wilmer Hale after retiring from the Department of the Air Force, before joining SEF.

16.     ReThink was a small company in India, with no more than 3 or 4 employees at any one time. The initial idea for ReThink was for its employees to create "tools," that is small, generic modules of software that could be plugged into any larger software project. As described

below, however, GCE's use of ReThink went well beyond tools, and well beyond what was

contemplated by the Janacek e-mail on the use of ReThink.

17.    Mr. Kalluru specifically included the Place of Performance requirement in his e-

mail of August 18, 2011, to Mr. Janacek of SEF. Pl. Ex. I-1 ("8.0 Place of Performance").

18.    Mr. Kalluru described the work to be done in India as follows:

> [T]he work in India will consist of coding small modules to plug and play with a software
> product to be built in the U.S. Essentially, the coding in India will be for individual
> computer screens. The coding would be written to a database and brought to the U.S.,
> where validation rules would be applied, end-to-end assembly would be accomplished,
> testing would take place, and the product would be plugged in with other screens before
> delivery to the customer.

*Id.*

19.    Mr. Janacek advised Mr. Kalluru in an e-mail on August 19, 2011, that

> You indicated that the software development will not take place on SAM development
> servers, but rather on GCE's workstations. You also indicated that, after task order
> award, the government agreed GCE could update the SAM servers on a weekly basis,
> instead of a daily basis. As I understand the term "software development" it includes
> more than just coding, but also the process of designing an application or solution,
> concept validation, integrating and testing code as well, [sic] As you describe the work, it
> appears that, although some coding is being done in India, the software development is
> taking place on GCE's workstations in the U.S. Therefore, there should no problem
> complying with this provision.

*Id.*

20.    In a follow up e-mail dated September 1, 2011, from Mr. Janacek to Mr. Kalluru

and a number of other GCE personnel related to the EEOC contract, Mr. Janacek reiterated:

> I don't believe this provision [the Place of Performance provision] precludes coding in
> India. I think it is intended to alert the contractor that some of the work must be
> performed at EEOC facilities.

Pl. Ex. I-2.[3]

---

[3] Mr. Janacek also advised Mr. Kalluru and GCE on whether the use of labor in India would violate the Trade
Agreements Act, which turned on whether the work done in India would be "substantially transformed" in the

*D.  SEF's Advice on the Use of H1-B Labor.*

21.      In early 2008, GCE identified a potential contracting opportunity with DoL.

22.      The DoL's request for proposals included a requirement that all personnel used on its contract be "legal immigrant aliens," i.e., U.S. Citizens or Green Card holders.

23.      In a pre-contract award inquiry to DoL posed at Mr. Muslimani's direction, GCE requested that DoL use the Department of Homeland Security's definition of "aliens," which Mr. Muslimani believed added clarity to the issue. DoL responded that it would not use DHS's definition. Def. Ex. UUU ("we should ask to rephrase in terms of 4300A"); Pl. Ex. IV-213 ("DoL will not use DHS's security directive").

24.       In late August 2011, GCE requested advice from SEF on the use of H1-B Visa holders on the DoL and EEOC contracts. Pl Ex. I-2. GCE quoted the "legal immigrant aliens" language from the contracts. *Id.*[4]

25.      Mr. Janacek again fielded the inquiry. On September 1, 2011, he advised GCE:

If GCE wishes to use India nationals on these contracts, it should get an express waiver of these provisions from the contracting officers.

*        *        *

Bottom line: Both contracts include Citizenship provisions that should be addressed with the contracting officers, if GCE wants to use India nationals on the contracts.

Pl. Ex. I-2.

---

United States. In the end, the government never focused on the Trade Agreements Act in its investigation of GCE and it turned out not to be an issue.

[4] H1-B Visas are grants of temporary entry into the United States for specialty occupations. https://www.uscis.gov/working-united-states/temporary-workers/h-1b-specialty-occupations-dod-cooperative-research-and-development-project-workers-and-fashion-models. Unlike the SAM Task Order issue, which involved the use of labor at ReThink in India, the issue on the DoL and EEOC contracts involved the use of H1-B labor in the United States.

26.     Mr. Janacek reiterated his advice on September 7, 2011, when he advised GCE
that the phase "legal immigrant aliens" "seems to exclude the use of the employees you describe
on the DoL and EEOC contracts." Pl. Ex. I-3. He again advised GCE:

> If GCE wishes to use these people on the DoL and EEOC contracts, we recommend that
> GCE obtain the written concurrence of the contracting officers for these contracts and a
> waiver or removal of the contract language.

*Id.*

27.     GCE never sought nor obtained a contract waiver from DoL or the EEOC for the
use of H1-B labor on these two contracts.

*E.   The Government Raid and the Engagement of Counsel for All of the Parties.*

28.     On March 22, 2013, GCE's offices were raided by agents from the Federal
Bureau of Investigation (FBI) and the General Services Administration (GSA). David Lucas,
GCE's Chief Strategy Officer (CSO) at the time, called Mr. Muslimani, who was in Palo Alto,
California. Mr. Muslimani called Jonathan Frankel, a partner with SEF, who arrived at the GCE
offices that day.

29.     David Lucas as CSO was in charge of day-to-day operations at GCE. Mr.
Muslimani, who lived in California, was responsible for high-level strategy decisions at GCE
and was not involved in its day-to-day operations in 2013. Mr. Lucas did not testify in this action
– the Court was advised by Plaintiff's counsel that Mr. Lucas had asserted his Fifth Amendment
rights and that he was expected to continue to do so.

30.     The FBI also paid visits to the homes of two GCE employees, Venkatesh Kalluru
and Ramprasad Anusuri, and interviewed these two individuals in their homes.

31.     Mr. Frankel called Kevin Evans, a partner in SEF's Denver office who specializes
in white collar criminal defense and government investigations.

32.     After Mr. Frankel debriefed a number of the GCE employees, it appeared to Mr. Frankel and GCE that the government was interested in: (a) ReThink India; and (b) the certifications submitted by the company on the DoL contract. Mr. Kalluru reminded Mr. Frankel that the company had sought advice on both issues from SEF, and that Mr. Janacek had responded to the inquiries. Mr. Frankel had his staff at SEF pull the Janacek e-mails for review.

33.     Mr. Frankel and Mr. Evans saw the potential for an advice of counsel defense from the outset. They both agreed that it was unlikely that SEF could represent GCE in court if the government were to institute litigation (criminal or civil) against GCE.

34.     The evidence diverges on what Mr. Muslimani discussed with the SEF attorneys on the day of the raid, and thereafter. Mr. Muslimani testified that he did not recall any discussions with Mr. Frankel or Mr. Evans on the day of the raid. Mr. Frankel and Mr. Evans, on the other hand testified that they immediately recognized the potential for an advice of counsel defense based on the Janacek e-mails and that they explained to Mr. Muslimani the nature of the potential defense. They both testified that Mr. Muslimani replied that he trusted SEF, that he needed their services, and that he implored them not to abandon GCE in its hour of need.

35.     Mr. Frankel further testified that he spoke with Mr. Muslimani a second time about a potential advice of counsel defense, before GCE signed an engagement letter with SEF for the investigation. Mr. Muslimani again was adamant that he did not recall such a conversation.

36.     Both Mr. Frankel and Mr. Evans recognized that there was the potential for a conflict based on a potential advice of counsel defense, and because Mr. Janacek potentially could have been called as a witness in the case. They both viewed the conflict as a "potential" conflict, not an actual conflict. They both testified that they counseled Mr. Muslimani that they

8

were not in a position to advise him on the advice of counsel defense, and that GCE should

consult with other counsel concerning the availability of the defense.[5]

37.     The defense team at SEF included an associate attorney by the name of Steven

Tibbets. At Mr. Evans' request, Mr. Tibbets researched conflicts of interest and ethics laws and

rules, including D.C. Rule of Professional Conduct 1.7 ("Conflict of Interest: General Rule"). Pl.

Ex. II-151. Mr. Evans described this issue as one of "paramount importance." Pl. Ex. IV-288.

38.     Mr. Tibbets' notes state: "Need to research advice of counsel defense in context

of r. 1.7;" and "Need to see if John [Janacek] is the only source of information to support

elements of advice of counsel defense." Pl. Ex. II-42.

39.     Mr. Tibbets' notes further indicate: "Rule 1.7 – 'personal interest of lawyer' is

basis for conflict, but client can waive with informed consent." He stated: "Conclusion – We

definitely have a Rule 1.7 conflict based on lawyer's interest," and "informed consent needs to

be as detailed as possible and in writing." *Id.*

40.     An additional handwritten note by Mr. Tibbets states: "If they pursue advice of

counsel – are we in an ethical bind?" Pl. Ex. II-43. Mr. Tibbets indicated on a copy of D.C. Bar

Rule 1.7 (Conflict of Interest: General Rule): "Problem." Pl. Ex. II-14.

41.     Internally, SEF decided to "wall off" Mr. Janacek from the investigation, so that

his testimony would not be influenced by the events transpiring in the investigation. Pl. Ex. IV-

287. (The Plaintiff's experts viewed this as a damaging mistake.)

42.     Mr. Frankel and Mr. Evans agreed, despite Mr. Tibbets' conclusion that SEF had

a conflict, that there was no *present* conflict, but that a conflict might arise should litigation be

initiated against the company. They viewed the conflict as waivable, at least for as long as no

---

[5] Mr. Muslimani testified that he discussed with David Lucas that there was a "potential obstacle," or a "potential limitation" on SEF's ability to represent GCE but that he and Mr. Lucas decided to proceed with SEF.

criminal or civil charges were pending. Mr. Evans was of the belief that SEF could not advise

GCE on the availability of the advice of counsel defense at all, and that GCE would have to

engage other counsel to advise it on this potential defense.

43.    On April 4, 2013, in an exchange of e-mails, the SEF attorneys recognized that

they would need outside technical experts to determine the extent of the work done in India. Def.

Ex. AAAAAAA. Kevin Evans argued that "penny wise and pound foolish" was a bad idea in this

sort of investigation and that this could be a "bet the company" kind of case. *Id.*

44.    Mr. Frankel testified that he had a conference call with Mr. Muslimani, Mr.

Lucas, and Mr. Kalluru on April 8, 2013, in which he advised them that the company had a

potential advice of counsel defense. Mr. Kalluru said in that conversation that the company had

relied on SEF's advice, and described the work being done in India by ReThink as limited to

"tools." Mr. Frankel either did not make, or he did not keep, any notes of the April 8th

conversation.

45.    On April 18, 2013, Mr. Frankel sent an e-mail to David Lucas, estimating that the

legal fees for the next six (6) months could be in the neighborhood of $476,000.00 to

$716,000.00 (including $44,000.00 that had been billed for work completed in March 2013) and

that the fees for experts could be in the range of $50,000.00 to $75,000.00 over the same period.

Def. Ex. X.

46.    On May 23, 2013, approximately two months after the government raid, Mr.

Frankel sent David Lucas an engagement letter entitled *"Terms of Representation – SAM Grand

Jury Investigation."* The engagement letter included the following provision:

> **Potential Limitation on Our Ability to Represent GCE.** As you know, our firm
> provided GCE with advice regarding the company's ability to use ReThink IT's Indian
> operations in connection with various government contracts, including the SAM task
> order. At some point in this investigation, or if the Government pursues criminal charges,

either GCE or individual employees may wish to raise an "advice of counsel" defense, which would argue that GCE or the employees lacked the intent to commit fraud because they were relying on our firm's earlier advice. The availability of such a defense turns on, among other things, whether the lawyers were given full and accurate information about the proposed course of conduct.

As we have discussed with you and Ray on several occasions, both telephonically and in person, we would be unable to represent GCE if it decided to assert such a defense or even advise on the defense's availability. We could even be required to withdraw from the representation, or forego representing GCE in any criminal proceedings, depending on whether GCE or individual employees planned to assert the defense.

You and Ray have expressly stated that you acknowledge this limitation on our ability to represent GCE, but would still like us to represent you during the investigation phase of this Matter. **If that is still your understanding, please initial here:** [initialed "DL" indicating the initials of David Lucas].

We encourage GCE to retain other counsel to advise the company on whether it can and should pursue an "advice of counsel" defense.

Pl. Ex. II-47 (emphasis in original).

47.     Mr. Muslimani testified that he authorized Mr. Lucas to sign the engagement letter. When paragraph 5 was brought to his attention, he again described this as an "obstacle" that he could do something about, so he authorized Mr. Lucas to sign the letter.

48.     Given the potential for criminal charges against the employees, SEF recommended a number of attorneys for GCE's employees. Pl. Ex. IV-26. As it turned out, all of these attorneys were some of the highest-priced legal talent in the Washington, D.C. region. The attorneys who were engaged included Ty Cobb of Hogan Lovells for Mr. Muslimani, David Kendall of Williams and Connelly for Shiva Kasanagottu, Brent Gurney at Wilmer Hale (Mr. Frankel's old law firm) for Mr. Kalluru, and Wick Sollers of King and Spalding as GCE employee pool counsel.

49.     Mr. Frankel testified that David Lucas wanted "high powered" legal talent to represent the individuals in order to send a message to the government that GCE was serious about defending its employees.

50.     GCE had a director's and officer's insurance policy, but the policy was limited to $1.0 million. The insurance company would not pay the hourly rates of the lawyers who were engaged to represent the individuals, so they received partial payments from the insurance policy until it was exhausted, and were forced to carry receivables from GCE for the remainder of the case.

    *F.  Serendipity.*

51.     In late 2012, Mr. Muslimani decided that he would create a spinoff from GCE that ultimately became known as Serendipity. Pl. Ex. I-39. Serendipity was created in order to take advantage of what Mr. Muslimani perceived to be a move to "Big Data," that is, mining massive quantities of data for insights about the users.

52.     Mr. Muslimani engaged the law firm of Cooley, LLP to assist with this corporate transaction. Mr. Muslimani and certain other employees of GCE owned Serendipity; it was not a GCE subsidiary. Serendipity's offices were located in Palo Alto, where Mr. Muslimani lived. Mr. Muslimani was heavily engaged in getting Serendipity up and running in late 2012 and early 2013.

53.     In March to April of 2013, GCE invested $1.0 million in Serendipity in exchange for 15% in preferred shares in the company. GCE also supported Serendipity with shared accounting and other services that ultimately added up to an additional $600,000.00. Pl. Exs. IV-80 (describing a meeting held to discuss the Serendipity investment); IV-212 (Serendipity timeline).

12

54.     GCE novated (that is, assigned with the consent of the government) one of its government contracts to Serendipity. Pl. Ex. III-74.

55.     GCE's continued investment in and support of Serendipity became an issue about which the government began to inquire in the investigation. It also became a source of frustration for Mr. Evans and SEF, who by late 2013 and early 2014 were carrying a very large receivable from GCE. For his part, Mr. Muslimani insisted that "the lawyers still don't understand Serendipity." Pl. Ex. III-5.[6]

G.  *The Investigation Expands.*

56.     Initially, GCE and SEF believed that the raid was triggered by a security breach related to IBM on the SAM Task Order. This quickly proved not to be the case.

57.     GCE produced a White Paper on the use of ReThink, which was never submitted to the government. Def. Ex. RRRRR. GCE's White Paper described ReThink as working on "generic tools." *Id*., pp. 13-15.

58.     In early June 2013, at a meeting with representatives of the U.S. Attorney's office, GCE's counsel brought up the idea of "tools." GCE's strategy was to describe the work that was done in India by ReThink as only "tools," or small software modules that could be plugged into the software product in the United States. This became known as the "tools" strategy. In response, Lindsey Kelly, the Assistant U.S. Attorney, stated that the case was about much more than just tools, to the point where she told the lawyers she did not want to hear about tools any more in connection with the case.

---

[6] GCE's support for Serendipity could not have helped matters at a time when the legal bills and other expenses for the government investigation were mounting.

59.     Ms. Kelly also advised the GCE attorneys in this June meeting that the government was looking at the DoL contract and perhaps one other contract. She mentioned the possibility of target letters going out to individuals shortly.

60.     On June 25th, the government sent out target letters to certain individuals at GCE, including Mr. Muslimani.

61.     On July 3, 2013, David Kendall, Mr. Kasanagottu's attorney, called Ms. Kelly to get a "flyover" of the case. In this conversation, Ms. Kelly stated that there were three areas of concern for the government: "(1) proper clearances; (2) work done by U.S. citizens; and (3) work done either at Reston or at a facility designated by GSA." Def. Ex. CC. She stated that the evidence indicated that people in India were doing work on the GSA contract, in such a way as to hide their identities. *Id.*; *see also* Pl. Ex. II-12 (Anusuri e-mail 9/13/11, at SEF 0032886: "Be cautious in NOT using the above credentials from India.") She referenced a "third contract," the DoL contract, which was "much larger in dollar terms than the two GSA contracts." Def. Ex. CC.[7]

62.     In August, SEF produced a "Strategy Sheet" on how it intended to deal with the investigation. Pl. Ex. I-13. The strategy included attempting to demonstrate that there was no criminal intent in using ReThink employees on the SAM Task force. *Id.*, p. 3.

*H.  SEF Engages Elysium.*

63.     SEF engaged a consulting firm, Elysium, located in Cambridge, Massachusetts, to analyze the extent to which coding on the SAM Task Order was done by the ReThink employees

---

[7] Mr. Muslimani testified that he did not understand that the use of H1-B Visa labor on the DoL contract was the government's focus until he attended a meeting at the Hogan Lovells offices in early November. This, however, was because he was in California and was not involved in GCE's day-to-day activities. The government clearly was focused on the DoL contract as early as June. By November, Mr. Muslimani understood that the H1-B Visa issue was a "serious threat" to GCE, and that some of the GCE personnel could "go to jail" as a result.

in India. Elysium's task was made much more difficult (and expensive) by the fact that GCE's servers had crashed and much of the information had to be reconstructed.

64.    Elysium concluded that a substantial amount of the SAM Task Order coding was done in India, thereby seriously undermining GCE's claim that only small, generic modules were being coded in India. Pl. Ex. III-131, 132.

65.    Elysium concluded that the ReThink employees had "unhindered" access to the source code on the SAM Task Order, and that the ReThink employees were remoting in to desktops in Reston from India using Mr. Anusuri's credentials. Elysium found that "significant" amounts of work were being done in India. Pl. Ex. III-132.

66.    Given the very substantial amount of coding that was done at ReThink on the SAM Task Order, Elysium was tasked with re-packaging the data, focusing on the value of what was produced at ReThink, as opposed to the volume. As a result, Elysium produced two draft reports that indicated that somewhere between 14.3% (based on billing records) and 12.9% (based on source code) of the value of the SAM Task Order was performed in India. Pl. Ex.III-131, 132.

   I.    *The "Get Well Plan;" GEC Hires Anna Lueje.*

67.    The Elysium draft reports dictated a change in strategy. SEF advised GCE to implement a "Get Well Plan," which included the termination of senior GCE personnel and the hiring of in-house counsel, in order to demonstrate to the government that GCE was a responsible contractor.

68.    Mr. Muslimani was not in favor of the Get Well Plan, and resisted the termination of the GCE individuals as being counterproductive to the interests of the company. He did, however, give his assent to the plan, under pressure from SEF's attorneys. As a result: (a) David

Lucas and Nancy Gunsauls were both terminated; and (b) GCE hired Anna Lueje as its in-house general counsel.

69.      Mr. Frankel knew Ms. Lueje from when she was employed in-house at Northrup Grumman and Mr. Frankel was with Wilmer Hale. Mr. Frankel strongly recommended that GCE hire Ms. Lueje. Pl. Ex. IV-32; Def. Ex. ZZZZZZ-7. Mr. Frankel did not recommend or suggest any other candidates to GCE. Although Mr. Muslimani was concerned about the costs of hiring a new general counsel, he agreed to Mr. Frankel's recommendation and hired Ms. Lueje. Ms. Lueje began her employment with GCE in September.

70.      By the end of the summer, the legal bills were skyrocketing from the various law firms. SEF was sending GCE bills in the amount of $200,000.00 per month. The other law firms were submitting very substantial legal bills. The Elysium report cost over $600,000.00, for approximately five months' worth of work (July – November). A firm by the name of Clicks, which was hosting a web site for data for the lawyers, was owed about $200,000.00 by the end of 2013. As a result, GCE experienced a severe cash shortage.

71.      By September, GCE had approximately $1.0 million in legal fees and expenses associated with the investigation, and was expecting another $1.0 million. GCE professed to be "baffled" by a bill for $90,000.00 from Mr. Cobb's firm, Hogan Lovells. Pl. Ex. IV-9. As a consequence, the company was forced to let 10% of its staff go in a cost-cutting measure.

72.      At the end of September, GCE's Balance Sheet was showing a *negative* $2.7 million in net equity. Pl. Ex. IV-269.

73.      Problems developed between Mr. Muslimani and Ms. Lueje almost immediately. Mr. Muslimani felt that Ms. Lueje was more beholden to SEF than to him as GCE's CEO. He

resented the fact that she would forward confidential e-mails between Ms. Lueje and him to SEF
and the other lawyers. Pl. Ex. II-97.

74.     In mid-October, Ms. Lueje noted that the legal bills were increasing and that the
company was in danger of running out of cash. She stated that she thought that the company
needed to explore bankruptcy as an option. Pl. Ex. IV-36. Mr. Evans responded dryly: "This is
not going to end well. We should have required a retainer." Pl. Ex. IV-38.

75.     By November, the legal fees and expenses had greatly exceeded the previous $2.0
million estimate, and were continuing to mount.

76.     Mr. Evans further expressed his concern that the company had not created a
reserve sufficient to pay all the legal fees and expenses. Pl. Ex. II-99. Mr. France, GCE's Chief
Financial Officer (CFO), testified that the company simply did not have sufficient resources to
create such a reserve.

77.     Anna Lueje suggested that GCE should pay SEF $200,000.00 per month to catch
up on the firm's invoices. Pl. Ex. III-69. She also suggested that Mr. Muslimani should put a
hold on further investments in Serendipity. *Id*. ("The plans to invest in a new business need to be
put on hold.")

*J.   The November Meeting with the Government.*

78.     The parties scheduled a meeting with the government for November 15th. The
lawyers held an advance meeting at the Hogan Lovell offices in D.C. Mr. Muslimani attended
this meeting.

79.     At the meeting at Hogan's offices, the attorneys discussed a change in strategy –
essentially that GCE had no defenses to the government's claims, but that it was putting its house
in order by firing certain personnel and hiring an in-house general counsel. Def. Ex. BBBB

(Power Point presentation). This, as noted above, became known as the Get Well Plan. Mr.

Muslimani continued to express his concerns about this strategy.

80.    On November 11th (only four days before the scheduled meeting with the

government), Mr. Evans sent an e-mail to Anna Lueje, in which Mr. Evans threatened to

withdraw from the case, unless: (a) Mr. Muslimani demonstrated that he was fully committed to

the new strategy; and (b) SEF received a substantial payment on its invoices. Pl. Ex. III-71. Mr.

Evans demanded the termination of GCE's Director of Human Resources, Avneet Hundal, and

another employee, Ms. Gunsauls, and threatened not to meet with the prosecutors unless GCE

agreed to terminate them. Pl. Exs. IV-68, IV-70.

81.    Mr. Frankel viewed the Get Well Plan as "meaningful corrective action." Pl. Ex.

IV-186. Mr. Frankel pressed Mr. Muslimani for a decision that day (November 12th) or the next

day. *Id.*

82.    Matthew France, GCE's CFO, was concerned with how the company was going

to pay for the Get Well Plan. The company had roughly $1.5 million in retained earnings, which

it needed to run the company, but it had over $2.0 million in outstanding professional fees and

expenses. Pl. III-72.

83.    Although Mr. Muslimani saw the terminations as being counter-productive for the

company, he agreed to the terminations.

84.    In anticipation of the meeting with the government, SEF prepared a PowerPoint

presentation on the talking points that they hoped to cover in the meeting with the government

(this was not shown to the government in the meeting). Pl. Ex. I-33. In the PowerPoint

presentation, SEF alluded to the fact that "advice was sought re use of ReThink." *Id.*, p. 4.

18

85.     Also shortly before the meeting with the government, Kevin Evans stated that there was "no way" that he was going to "cry poor" on behalf of GCE. Pl. III-73.

86.     At the November 15th meeting with the government, a DoL special agent noted that Ms. Hundal had applied for a number of H1-B Visas, and that these employees were slated to be working on the DoL contract. One of the H1-B applications was submitted after Mr. Janacek's advice to GCE to seek a waiver (which, as stated above, never happened). Def. Ex. NNN.

87.     At the conclusion of the meeting the government attorneys requested a proposal from GCE to settle the matter. GCE and the attorneys viewed this as a highly positive development. *See id*.

88.     At this point, SEF was demanding that GCE pay it $100,000.00 every two weeks, to catch up on its invoices. The parties agreed that GCE would pay $75,000.00 every two weeks. *See* Pl. Ex. IV-222.

89.     On November 19th, Mr. Evans demanded payment of the SEF legal fees. Pl. Ex. III-76. Anna Lueje responded by stating that Mr. France was taking the position that the company could not afford to pay SEF's bills. *Id.*

90.     The legal fees, and the accruing fees with Elysium and Clicks, caused GCE to have to prioritize payments to its vendors and other creditors. GCE had another round of layoffs in early 2014.

*K.  GCE Hires Michael Freeman.*

91.     At the end of 2013, GCE hired Michael Freeman as its Chief Operating Officer. He started with the company in January 2014. Mr. Freeman has an extensive background acting

as the CEO or COO for distressed companies, particularly in the technology industry. By the

time that Mr. Freeman arrived at GCE, GCE unquestionably was in distress.

92.     At the time that Mr. Freeman began his employment with GCE in January, GCE

had 111 employees, down from a recent 125 employees. The company had ceased using

ReThink.

93.     Mr. Freeman quickly determined that GCE was running out of money, owing to

the legal fees and other costs associated with the government investigation. It became clear to

Mr. Freeman that the company should explore strategic options, including a sale of its assets.

94.     Mr. Freeman detected tension between Ms. Lueje and Mr. Muslimani. Ms. Lueje

stated that Mr. Freeman was brought on board to implement the Get Well Plan, while Mr.

Muslimani wanted to grow the company, two goals that were inconsistent given GCE's financial

condition at the time. *See, e.g.,* Pl. Ex. II-102 (Muslimani e-mail, 2/27/14).

95.     Mr. Freeman and Ms. Lueje (whom Mr. Muslimani fired in late March or early

April) began to search for investment bankers to handle a strategic transaction. Ultimately, Mr.

Muslimani picked Asgaard to act as investment banker, owing to its experience in distressed

asset sales.

*L.  The Global Settlement Submission ("GSS").*

96.     In January 2014, under pressure of an imminent indictment from the U.S.

Attorneys' Office, SEF submitted a Global Settlement Submission ("GSS") to the U.S. Attorney.

Pl. Ex. I-29.

97.     Mr. Muslimani received a draft of the GSS only a few days before it was due to

be submitted to the government, though he did approve its submission. Pl. Ex. IV-158 (Anna

Lueje e-mail to Mr. Muslimani, 1/28/14).

98.     Prior to submission of the GSS to the government, Mr. Frankel met with Mr.

France, Mr. Freeman and the attorneys for the individuals. It was Mr. Freeman's view that GCE

only had a limited number of weeks left to survive, given its financial condition. The parties

agreed that the thrust of the GSS would have to be a sale of GCE's assets.

99.     The GSS offered to settle all outstanding issues with the government on GCE's

contracts with GSA (the SAM Task Order and another GSA contract described as the FPDS-NG

contract), DoL (NCFMS contract and the HR Works Task Order), the EEOC, the Coast Guard

and the Secret Service for $896,000.00. Pl. Ex. I-29, pp. 2, 63-88.

100.    Notably, with respect to ReThink, the GSS represented:

When we eventually began to receive documents that we had requested reflecting the
work performed by ReThink India we enlisted the services of Elysium Digital
("Elysium") in Boston, with the approval of GCE, to help us determine the actual type
and amount of work performed on SAM by ReThink India. With Elysium's help, we
learned, and have shared with the Government, that *ReThink India performed work
beyond tools generation, and in fact performed a portion of the software development on
the project.*

*Id.*, p. 10 (emphasis added).

101.    With respect to the defense that ReThink only performed work on tools, the GSS

further stated: "We spent weeks attempting to understand and verify this suggestion, which

proved to be false." *Id.*, at p. 52.

102.    GCE also acknowledged that it had used 30 employees on the DoL contract, and

25 employees on the EEOC contract, who were not U.S. Citizens or legal immigrant aliens, in

violation of both contracts. *Id.,* pp. 30-31, 40-41.

103.    GCE noted in the GSS that it had hired a new General Counsel and Chief

Compliance Officer (Ms. Lueje), that it had terminated the services of personnel whom it

believed were responsible for the various problems being investigated by the Government, and

that it was in the process of shutting down ReThink India. *Id.*, pp. 53-54.

104.    GCE asserted in the GSS that its financial condition was "dire and deteriorating."

*Id.*, p. 60. It noted that GCE had suffered a net loss of over $4.5 million in 2013. *Id.*, p. 68.

Indeed, GCE flatly stated: "With no ability to invest in product and no future federal market

available, the inevitable conclusion is that GCE will cease to exist within a short period of time.

In order to ensure continuity of operations for DoL and EEOC, resolve the investigations with

the Government and satisfy its existing debt and anticipated upcoming obligations, GCE must

sell its assets." *Id.*, p. 69.

105.    On the criminal side, GCE requested a non-prosecution agreement. *Id.*, pp. 61-63.

On the civil side, GCE proposed a series of monetary penalties: (a) $55,000.00 on the SAM

contract; (b) $44,000.00 on the FPDS-NG contract; (c) $368,500.00 and $88,000.00 on the

NCFMS contract; (d) $55,000.00 on the HR Works task order; (e) $38,500.00 on the AMS

contract; (f) $176,000.00 on the EEOC contract; (g) $65,500.00 on the Coast Guard contract; and

(h) $93,500.00 on the Secret Service contract. *Id.*, pp. 71-88.

106.    The Government did not accept GCE's proposal, but viewed the GSS as a starting

point for further discussions. Peter Hyun, the Assistant U.S. Attorney on the civil side of the

case, said that the government was looking for something more like $10.0 million to settle the

case.

107.    By the end of January, Mr. France called Mr. Muslimani and told Mr. Muslimani

that he wanted to resign. Mr. Muslimani asked him to think about it; ultimately, he stayed on as a

Controller, but had no further substantive contact with the law firms.

108.    In February, there was another round of layoffs. After submission of the GSS to the government, the government requested financial statements for GCE, Serendipity, ReThink and Mr. Muslimani, in order to determine whether the GSS was accurate with respect to GCE's professed inability to pay any substantial fines to the government.

109.    By March or April, GCE was unable to pay its rent. It was also triaging its payables, prioritizing payroll and other immediately necessary expenses, while deferring those invoices that could be put off without serious harm to the company.

*M.  SEF Withdraws as GCE's Counsel.*

110.    On November 19, 2013, Mr. Evans advised Mr. Frankel that he was going to "stop all further work." Pl. Ex. III-76. He also was demanding payment of $100,000.00 by wire transfer by the end of that week. *Id.*

111.    On November 20, 2013, Mr. Evans e-mailed Ann Lueje, GCE's in-house counsel, advising her that SEF was demanding payment of $100,000.00 every two weeks and that "absent that agreement we will be terminating on Friday." Pl. Ex. III-77.

112.    On November 25, 2013, Mr. Evans forwarded a D.C. Bar Arbitration form to Ms. Lueje, threating to sue GCE for the fees that were due and owing to SEF. Pl. Ex. IV-39.

113.    The situation continued to deteriorate in December and January, with SEF demanding payment not only of its own fees but those of the law firms hired for the individuals, as well as Clicks and Elysium. Pl. Ex. III-87, 89, 90.

114.    Anna Lueje was supportive of the payment of the fees wherever possible, but Mr. France continued to question where the funds would come from for the payment of the fees. *See id.*; Pl. Ex. 77.

115.    In early February 2014, in a discussion between Assistant U.S. Attorney Peter Hyun and Kevin Evans, Mr. Hyun advised Mr. Evans that the government was looking for "eight figures" in order to settle the government's civil FCA claims. Pl. Ex. IV-59.

116.    The attorneys for the individuals also were demanding payment and threatening to withdraw as their counsel. Pl. Ex. III-5 ("The feedback that I have about Hogan is that their bills must be brought CURRENT by January 20"); III-90 ("it is now more imperative than ever that you work out an IMMEDIATE payment arrangement with Hogan, King and Spalding, and Williams and Connolly")

117.    Anna Lueje was attempting to forestall SEF's withdrawal, stating: "The Company needs the firm now more than ever." Def. Ex. UU. By this point, Mr. Muslimani was openly contemptuous of SEF and its efforts to resolve matters with the government. *Id.* Mr. Evans, for his part, evidenced disdain for Mr. Muslimani. Pl. Ex. III-104.

118.    On April 9, 2014, SEF formally withdrew as GCE's counsel. Def. Ex. HH.

119.    GCE replaced SEF with the law firm of McGuire Woods. David Swann acted as bankruptcy counsel. Charles McIntyre took over the government investigation representation.

*N.  GCE Files for Bankruptcy and Sells its Assets to the Government.*

120.    By March of 2014, GCE had unpaid obligations to the law firms and to Elysium and Clicks of between $4.5 million and $5.0 million.

121.    Given the company's financial condition, Mr. Freeman initially believed that a "zero sum" for the company's assets (that is, just enough to pay all of the creditors, including a fine to the government, and no return to equity) would be the best achievable outcome.

122.    The DoL had a very strong interest in continuity of operations with respect to the financial management software (the SSP) owned and operated by GCE. In the summer of 2014,

Asgaard (Mr. Reardon) and GCE (Mr. Freeman and GCE's new in-house counsel Mr.

McCarrick) met with DoL and GSA to discuss a possible sale of the company's assets (its

primary asset being the SSP platform) to the government.[8]

123.    In a highly unusual arrangement for the government, in August 2014, after

extensive negotiations led by Mr. Freeman with the assistance of Asgaard, the government

agreed to purchase the SSP from GCE. Specifically, GCE entered into a modification of its

contract with DoL under which DoL agreed to purchase what were described as the "DoL

Deliverables" for a purchase price of $5.25 million. Pl. Ex. II-56, p. 12. Additionally, GCE and

GSA entered into a contract modification under which GSA would purchase what were

described as the "GSA Deliverables" for a purchase price of $18.25 million. *Id.*, p. 14

124.    The total purchase price for the company's assets related to the DoL contract and

the GSA contract was $23.5 million. *Id.*

125.    On September 4, 2014, GCE filed a voluntary petition under Chapter 11 in this

Court. Case No. 14-13290-BFK, Docket No. 1. The Court approved GCE's employment of

McGuire Woods as counsel for the company, and approved the engagement of Asgaard as the

company's investment banker. *Id.,* Docket Nos. 84, 162.

126.    The government filed a Proof of Claim in the amount of $30,939,038.86. *Id.*,

Proof of Claim No. 11-1.

127.    GCE immediately filed a Motion for approval of the sale of its assets to DoL and

to GSA. *Id.*, Docket No. 9.

128.    On September 19, 2014, the Court entered an Order approving the sale of the

Debtors' assets to DoL and GSA. *Id.*, Docket No. 62.

_____

[8] John McCarrick replaced Ms. Lueje as GCE's general counsel. He was with the company through the asset sale,
and left in 2015.

129.    Once the sale closed, 58 of the remaining employees were transitioned to Booz

Allen Hamilton, a larger government contracting firm that took over responsibility for the DoL

financial management system.

130.    Asgaard was paid $1.1 million for its services in connection with the sale. In

addition, GCE incurred approximately $2.0 million in expenses for two Key Employee Retention

Plans to retain the employees and management to keep the DoL financial management system

operating without interruption while the bankruptcy case was pending, until the sale closed.

*O.  Resolution of the Government's Claims.*

131.    In October 2014, the government made a reverse proffer outlining its case, to

GCE. Pl. Ex. IV-18. In the reverse proffer, the government claimed over $30 million in damages.

132.    The parties – Mr. McIntyre from McGuire Woods, Mr. Muslimani, and the

government attorneys – met in October. The government contended that the use of H1-B labor

on the DoL contract was a violation of the False Claims Act (FCA). There was little to no

discussion of the use of ReThink on the GSA Task Order. The focus of the meeting was on civil

FCA claims, not on criminal liability. The parties negotiated over how much GCE would have to

pay in order to resolve the civil FCA claims.

133.    GCE, now represented by Mr. McIntyre, took the position that the government

had little in the way of damages. Mr. McIntyre also believed that any criminal charges were

unlikely.

134.    On October 31, 2014, Mr. McIntyre sent a settlement letter to the government in

which GCE offered to pay $2.688 million in order to settle the government's civil claims against

GCE. Pl. Ex IV-18.

135.    The government responded four days later on November 4th, stating that the government's attorneys were willing to recommend a settlement of $14.5 million. Def. Ex. NN.

136.    McGuire Woods responded with a settlement offer of $4.48 million. Def. Ex. OO. The government rejected this offer as too low. Def. Ex. PP. In its response, the government relied heavily on the admissions made in GCE's GSS concerning the use of H1-B labor. *Id.* ("You categorically assert 'there is no evidence to support [a claim that GCE had no intention of complying with the citizenship requirement when it submitted the DoL proposal]' without even acknowledging facts proffered *by GCE itself* throughout the government's investigation.") (Alteration and emphasis in original).[9]

137.    In March 2015, GCE and the Government entered into a Settlement Agreement under which GCE agreed to pay the Government $9.0 million for what was described as the "Covered Conduct" in connection with GCE's government contracts. Def. Ex. GG.

138.    The term "Covered Conduct" included the use of labor in India on the SAM Task Order as well as the use of H1-B Visa labor in the United States on the DoL and EEOC contracts. *Id.*, Exs. A-E.

139.    The $9.0 million civil penalty was not allocated to any of the specific violations on any of the individual contracts. *Id.*, ¶¶ 2, 3.

140.    GCE filed a Motion for approval of the settlement with the Government on March 12, 2015. Case No. 14-13290-BFK, Docket No. 250.

141.    In its Motion to Approve its settlement with the government, GCE represented to this Court that the settlement was "extremely beneficial to the Debtor's estate and creditors," and

---

[9] The government also stated in this letter that the FCA defines the terms "knowing" and "knowingly" for purposes of civil liability as: (i) having actual knowledge of information; (ii) acts in deliberate ignorance of the truth or falsity of the information; or (iii) acts in reckless disregard of the information. The government specifically noted that the FCA requires "no proof of specific intent to defraud," citing 31 U.S.C. § 3729(b)(1)(B). Def. Ex. PP, at fn. 6.

that the settlement "represents a compromise that is fair and equitable, falls well within the range of reasonableness and satisfies the standards for approval under applicable law." *Id*., Docket No. 250, ¶ 16.

142.   The Motion was approved on April 22, 2015. *Id*., Docket No. 332.

143.   Although the Settlement Agreement with the Government expressly did not release any criminal liability (Def. Ex. GG, ¶ 4(b)), GCE was not criminally indicted and no indictments were brought against any of the individuals employed by GCE.

144.   Mr. Muslimani agreed to the $9.0 million fine, though in his view, "we way overpaid." Although Mr. Muslimani and Mr. France both testified that they believed that the government would have accepted less than $9.0 million, this was speculation on their part and there was no evidence introduced to support this claim.

*P.   GCE Files This Legal Malpractice Action.*

145.   On May 7, 2015, GCE filed this adversary proceeding against SEF. The Second Amended Compliant contained Counts I and II, objecting to SEF's proof of claim and requesting a turnover of amounts paid to SEF that allegedly constituted unreasonable fees, Count III, a claim for legal malpractice, and Count IV for breach of fiduciary duty.[10]

146.   On March 7, 2016, Judge Mayer dismissed Count IV, the claim for breach of fiduciary duty, after finding that the breach of fiduciary duty claim essentially was duplicative of the legal malpractice claim stated in Count III. Docket No. 129.

147.   Discovery was extended through July 28, 2016. Docket No. 183.

148.   SEF filed a Motion for Partial Summary Judgment on July 12, 2016. Docket No. 176.

---

[10] SEF has filed a proof of claim in GCE's bankruptcy case in the amount of $603,279.73, for its pre-petition legal fees. Claim No. 2-1.

149.     GCE filed a Motion to Dismiss this adversary proceeding without prejudice under

Rule 41(b), but Judge Mayer denied the Motion. Docket Nos. 179 (Motion to Dismiss), 229

(Order). *Global Comput. Enters., Inc. v. Steese, Evans & Frankel, P.C. (In re Global Comput.*

*Enters., Inc.),* 561 B.R. 651 (Bankr. E.D. Va. 2016).

150.     The case was reassigned from Judge Mayer to Judge Kenney on September 12,

2016. Docket No. 230.

151.     GCE filed a Motion to Amend its Complaint for the third time, to add a claim for

fraudulent inducement (Count V). Docket No. 194. This Motion was denied on September 22,

2016, the Court having found that the proposed amendment was untimely and would have

prejudiced SEF in the litigation. Docket No. 237.

152.     The Court denied SEF's Motion for Partial Summary Judgment on November 30,

2016. Docket No. 261.

153.     Before the start of the trial, the Court granted in part and denied in part a Motion

in Limine filed by SEF. Docket No. 284. As a result of this Order, Mr. France was precluded

from testifying as to: (a) the alleged lost enterprise value of GCE; and (b) any alleged lost profits

on a contract that the government entered into with Booz Allen Hamilton for the same services

for which the government had contracted with GCE before the government bought the assets

from GCE. *Id.*

154.     At the conclusion of the Plaintiff's evidence, the Court granted the SEF's oral

Motion for Judgment on Partial Findings under Rule 52(c) on Counts I and II, relating to the

reasonableness of SEF's pre-petition legal fees, for the reasons stated on the record. Docket No.

300; *see also* Docket No. 303 (Def.'s Motion for Judgment on Partial Findings on Counts I and II).[11] This left only Count III, the legal malpractice count, for a determination.

*Q.  The Expert Witnesses at Trial.*

155.    GCE and SEF each presented two expert witnesses, on the standard of care and legal ethics. Overall, the Court found each of the experts to be forthright and credible.

*(i)    Barry Coburn.*

156.    Barry Coburn, an attorney licensed in D.C., Maryland, Virginia and New York, testified on the standard of care for GCE. He was qualified as an expert witness on white collar criminal defense. He testified as an expert for GCE.

157.    In Mr. Coburn's opinion, the standard of care required much more than SEF's engagement letter provided in the way of disclosure and discussion of the availability of the advice of counsel defense. Mr. Coburn opined that the letter should have contained much more explanation on the significance of the Janacek e-mails. For these reasons, Mr. Coburn opined that: (a) the conflict waiver in the engagement letter was "neither knowing nor voluntary," as required by the Rules of Professional Conduct; and (b) SEF's acceptance of the engagement at all was a breach of the standard of care because the conflict was, in Mr. Coburn's view, "patently unwaivable."

158.    Mr. Coburn noted that Mr. Janacek's e-mails went directly to the element of *mens rea,* or specific intent, on the criminal side of the False Claims Act. Mr. Coburn viewed the e-mails as "powerful" exculpatory evidence.

159.    While acknowledging that GCE "dropped the ball" on requesting waivers for the use of H1-B Visa labor on the DoL and EEOC contracts, Mr. Coburn opined that the H1-B Visa

---

[11] SEF also made an oral Motion for Judgment on Partial Findings under Rule 52(c) on Count III, which the Court took under advisement, awaiting the close of all the evidence. *See also* Docket No. 307.

issue on the DoL and EEOC contracts was "not as serious" as the Place of Performance issue on

the SAM Task Order. The Court, however, did not hear any factual basis for diminishing the

seriousness of the H1-B Visa issue and discounts Mr. Coburn's testimony that the H1-B Visa

issue was less serious than the Place of Performance issue.

160.    In addition, Mr. Coburn, responding to a question from the Court, candidly

acknowledged that his opinion was limited to the Janacek e-mails negating the *mens rea* element

only on the criminal side of the False Claims Act; Mr. Coburn conceded there is no *mens rea*

element on the civil side of the False Claims Act, nor is there one inherent in an ordinary breach

of contract claim.

161.    In Mr. Coburn's opinion, the use of the Janacek e-mails would have brought the

government's investigation to a close much sooner than it was in fact concluded.

> *(ii)*    *Michael Frisch.*

162.    Michael Frisch is Ethics Counsel and an Adjunct Professor of Law in Ethics for

Georgetown University Law School. Prior to his service with Georgetown Law, Mr. Frisch

served as Assistant Bar Counsel to the D.C. Bar for 17 ½ years. He was qualified as an expert in

legal ethics. He testified as an expert for GCE.

163.    Mr. Frisch opined, consistent with Mr. Coburn's testimony, that SEF's conflict

with GCE was not a waivable conflict, citing Rule 1.7 of the Rules of Professional Conduct for

the District of Columbia.

164.    Further, Mr. Frisch opined that SEF's engagement letter did not constitute

informed consent, as required by the Rules. (He explained that D.C. does not require informed

consent to be in writing; Virginia does.)

165.     He described Mr. Tibbets' legal research as "grossly inadequate," and "very superficial," though this seems to the Court to be an overly harsh assessment; the legal ethics issues presented here weren't that complicated and Mr. Tibbets was an attorney of nine years' standing.

166.     Mr. Frisch also opined that SEF breached its duty of loyalty to GCE under Rule 1.2 of the D.C. Rules of Professional Conduct in failing to raise the advice of counsel defense with the government.

167.     Mr. Frisch also criticized SEF for overstepping its bounds as counselors to GCE, asserting that SEF insisted that business decisions be made (e.g., laying off people in September 2013) that were not the law firm's to make. *See* D.C. Rules of Professional Conduct 1.13 (Organization as Client).

> *(iii)     Steven Salky.*

168.     Steven Salky is a partner with the Zuckerman Spaeder law firm in D.C. He was qualified as an expert witness in white collar criminal and civil litigation involving FCA claims. He testified for SEF.

169.     In Mr. Salky's view, the disclosure of the Janacek e-mail on ReThink (Pl. Ex. I-1) to the government for purposes of advancing an advice of counsel defense would have resulted in a waiver of GCE's attorney-client privilege, and would have resulted in the disclosure of Mr. Janacek's e-mails on the use of H1-B visa labor on the DoL and EEOC contracts (Pl. Exs. I-2 and I-3).

170.     Mr. Salky also viewed the first Janacek e-mail on ReThink as being potentially inculpatory, because as it turned out GCE substantially exceeded Mr. Janacek's advice on ReThink, as demonstrated in the draft Elysium reports.

171.    In Mr. Salky's opinion, assertion of the advice of counsel defense would have given the government access to e-mails that would have harmed GCE.

>        *(iv)    Stephen Saltzburg.*

172.    Stephen Saltzburg is a Professor at The George Washington University Law School. He formerly was a professor of law at the University of Virginia. He has served as a Deputy Assistant Attorney General in the Criminal Division of the U.S. Department of Justice where he was in charge of the government's criminal espionage cases. He served as an assistant to Judge Lawrence Walsh, the independent prosecutor in the Iran-Contra scandal during the Reagan Administration. He has written a widely-used textbook on criminal procedure. He has served on numerous boards and committees, including the U.S. Sentencing Commission, and the Advisory Committee on the Federal Rules of Criminal Procedure. He was qualified as an expert in legal ethics in white collar criminal defense matters. He testified as an expert for SEF.

173.    In Professor Saltzburg's view, SEF did not have a conflict of interest from the outset of its representation of GCE. Professor Saltzburg opined that SEF had a duty to disclose to GCE that it could not advise GCE on the advice of counsel defense and that GCE should engage counsel on the potential for this defense, which is precisely what SEF did in its engagement letter. Professor Saltzburg viewed Paragraph 5 of the GCE-SEF engagement letter to be consistent with SEF's ethical duties to GCE.

174.    Professor Saltzburg agreed with Mr. Salky's opinion that asserting the advice of counsel defense would have been counterproductive because it would have waived the privilege. In Mr. Saltzburg's view, GCE went well beyond what Mr. Janacek advised GCE it could do with respect to ReThink, relying on the Elysium draft reports.

175.     Professor Saltzburg opined that GCE had not followed Mr. Janacek's advice on the use of H1-B labor, because it did not seek waivers from the contracting officers. Further, in Professor Saltzburg's opinion, the disclosure of Mr. Janacek's e-mails on H1-B labor would have been damaging to the company's interests.

176.     Professor Saltzburg opined that the ReThink employees' use of their U.S. counterparts' passwords to remote in to desktops in the U.S., as well as the masking of IP addresses from e-mails in India, were evidence of knowledge of wrongful conduct on the part of the parties involved.

177.     Professor Saltzburg agreed that there was a potential for a conflict based on the advice of counsel defense, but that it was acknowledged by GCE from the outset of the representation and fully disclosed to GCE by SEF.[12]

### Conclusions of Law

The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334 and the Order of Reference entered by the U.S. District Court for this District on August 15, 1984. This is a non-core proceeding under 28 U.S.C. 157(c). Both parties have consented to the entry of final orders by the Bankruptcy Court. *Wellness Int'l Network, Ltd. v. Sharif*, 135 S.Ct. 1932 (2015); *see* Docket No. 109, Tr. 01/05/2016, pp. 20-21 ("THE COURT: Now, my assumption in granting [the motion to amend the complaint] is that you are consenting to the entry of a final judgment by the bankruptcy court. Is that correct? … MR. HOGE: We would consent -- THE COURT: -- the issue is, is whether or not you consent? MR. HOGE: We do.")

---

[12] Professor Saltzburg opined that SEF probably did commit an ethical violation in its refusal to turn over its files to Mr. McIntyre after it withdrew from the case. *See* D.C. Rule of Professional Conduct 1.16(d).

## I.      Virginia Law on Legal Malpractice Claims.

The parties agree that Virginia law controls the adjudication of the legal malpractice claim, although the D.C. Rules of Professional Conduct are also implicated here. The Court agrees that Virginia law controls – although SEF's offices were located in D.C. and Colorado, GCE was located in Reston, Virginia; the government raid took place in Reston; the case was prosecuted out of the U.S. Attorney's Office for the Eastern District of Virginia; the meetings with the government attorneys took place in Virginia; and the GCE bankruptcy case was filed in the Eastern District of Virginia. *Shortt v. Immigration Reform Law Inst.,* Civil Action No. 1:11CV144, 2011 WL 4738657, at *2 (E.D. Va. Oct. 3, 2011) (applying the place of performance under Virginia law in action for legal malpractice); *Toure v. Ubom*, Civil Action No. 3:10CV744–HEH, 2011 WL 1044901, at *3 n. 6 (E.D. Va. Mar. 16, 2011) (same).

In Virginia, a claim for legal malpractice sounds in contract. *O'Connell v. Bean*, 263 Va. 176, 181, 556 S.E.2d 741, 743 (2002); *Oleyar v. Kerr,* 217 Va. 88, 90, 225 S.E.2d 398, 400 (1976). A claim for legal malpractice requires proof of: (1) the existence of an attorney-client relationship that gave rise to a duty; (2) a breach of that duty by the attorney; and (3) damages proximately caused by the attorney's breach. *Williams v. Joynes*, 278 Va. 57, 62, 677 S.E.2d 261, 264 (2009); *Rutter v. Jones, Blechman, Woltz & Kelly, P.C.*, 264 Va. 310, 313, 568 S.E.2d 693, 695 (2002); *Allied Prods. v. Duesterdick*, 217 Va. 763, 766, 232 S.E.2d 774, 776 (1977). The plaintiff bears the burden of proving all three elements. *Joynes*, 677 S.E.2d at 62; *Campbell v. Bettius,* 244 Va. 347, 352, 421 S.E.2d 433, 436 (1992).

The Court will address the issues of breach and causation, below. Because the Court finds

for the Defendant on both issues, it is unnecessary to examine the Plaintiff's claims for

damages.[13]

### II.    The Court Finds that the Defendant Did Not Breach the Standard of Care.

Both of the Plaintiff's claims – the claim arising out of the Janacek e-mail on the use of

ReThink India on the SAM Task Order and the claim arising out of the Janacek e-mails on the

use of H1-B labor on the DoL and the EEOC contracts – allege that, had SEF asserted an advice

of counsel defense (or more accurately, had SEF stayed out of the case altogether and allowed

another law firm to assert an advice of counsel defense), GCE would have been in a much

stronger position to defend against the government's claims. In order to establish an advice of

counsel defense, the party asserting the defense must establish "(a) full disclosure of all pertinent

facts to an attorney, and (b) good faith reliance on the attorney's advice." *United States v.

Westbrooks*, 780 F.3d 593, 596 (4th Cir. 2015); *United States v. Powell*, 680 F.3d 350, 356 (4th

Cir. 2012). The good faith reliance element requires that the client "faithfully follow[]" the

attorney's advice. *United States v. Newport News Shipbuilding, Inc.*, 276 F.Supp.2d 539, 565

(E.D. Va. 2003). The Court concludes that on the ReThink advice, GCE substantially exceeded

Mr. Janacek's advice. The Court further concludes that on the H1-B labor issue, GCE ignored

SEF's legal advice altogether.[14]

---

[13] The Court granted the Defendant's Motion for Judgment on Partial Findings with respect to certain elements of the Plaintiff's damages at trial, most notably the Plaintiff's claim that it could have settled with the government for substantially less than $9 million, and the Plaintiff's claim that the company lost value as a result of its sale under distressed circumstances. The remaining elements of the Plaintiff's claimed damages consist of the costs of selling the company (the investment banker's fees), the costs of keeping the company up and running pending bankruptcy court approval of the sale (the Debtor's two key employee retention programs) and the legal fees associated with the bankruptcy itself.

[14] The legal ethics experts in this case presented contrasting views on whether a law firm's conflict arising out of a potential advice of counsel defense can be waived and if so, the extent to which that waiver must be the subject of truly informed consent. SEF viewed the conflict as a *"potential"* one, and believed that it could represent GCE at least through the investigation stage (it did not believe that it could represent GCE at a trial). GCE's experts, on the

A. *SEF's Advice on ReThink India.*

GCE argues that Mr. Janacek's e-mail of August 19, 2011, sanctioned the use of ReThink India for coding generally on the SAM Task Order. In the Court's view, however, GCE fundamentally misreads and overstates the nature of Mr. Janacek's advice. Mr. Janacek clearly limited his advice to the use of ReThink India for the creation of small modules to be plugged into the SAM code in the United States, as described to him by Mr. Kalluru. This description became known generally among the parties as "tools," a shorthand way of describing what Mr. Janacek advised GCE it could do. Most emphatically, Mr. Janacek did not say that "any coding performed in India is OK," or any advice to that effect.

The evidence is clear not only that GCE substantially exceeded Mr. Janacek's advice, but that its employees attempted to cover up the use of ReThink on the SAM Task Order through the masking of the ReThink employees' internet identifications and the use of Mr. Anusuri's password. The Elysium draft reports demonstrated that GCE substantially exceeded Mr. Janacek's advice. Pl. Ex. III-131, 132. GCE admitted as much in its GSS to the government. Pl. Ex. I-29, p. 10 ("With Elysium's help, we learned, and have shared with the Government, that ReThink India performed work beyond tools generation, and in fact performed a portion of the software development on the project.")

The Court further finds the testimony of Professor Saltzburg on the potential for a waiver of the attorney-client privilege to be relevant to this issue. A client can waive the attorney-client privilege by placing the attorney-client relationship in issue, "for example, by affirmatively invoking a defense of good faith reliance on advice of counsel." *United States v. Moazzeni*, 906 F.Supp.2d 505, 512 (E.D. Va. 2012); *LifeNet, Inc. v. Musculoskeletal Transplant Found., Inc.*,

---

other hand, described the conflict as an *"actual"* conflict from the outset, one that was not waivable under any circumstances. As the Court finds below, the conflicting views of the experts need not be resolved because GCE either exceeded SEF's advice or ignored it. Moreover, the Court finds for SEF on the issue of causation, below.

37

490 F.Supp.2d 681, 685 (E.D. Va. 2007) ("Once a party announces that it will rely on advice of

counsel . . . in response to an assertion of willful infringement, the attorney-client privilege is

waived."); *see also* Edna Sela Epstein, *The Attorney-Client Privilege and the Work-Product*

*Doctrine,* at 511 (5th ed. 2007) ("A client may not rely on 'advice of counsel' as the basis of a

defense of a claim without waiving all privileged communications on that issue.") The Fourth

Circuit has embraced the concept of subject matter waiver, so that the waiver will encompass all

communications on the same subject matter. *Sheet Metal Workers Int'l Ass'n v. Sweeney,* 29

F.3d 120, 125 (4th Cir. 1994); *United States v. Jones,* 696 F.2d 1069, 1072 (4th Cir. 1982).

Although GCE argues that Mr. Janacek's advice on ReThink India on the SAM Task Order was

separate and apart from that of his advice on the use of H1-B labor on the DoL and EEOC

contracts, no one could have predicted with any certainty just how far the waiver of GCE's

attorney-client privilege would have extended had GCE asserted the advice of counsel defense

on the SAM Task Order and ReThink India. Had the government been able to compel the

production of SEF's advice e-mails on the use of H1-B labor on the DoL and EEOC contracts

(that is, SEF's advice that GCE seek a waiver from the contracting officers), the disclosure of

these e-mails could have made matters worse for GCE, in effect, establishing a willful blindness

to the risks of proceeding to use H1-B labor without seeking a contract waiver.

Whether or not Mr. Janacek's advice on ReThink was objectively correct may never be

known.[15] What is clear, though, is that GCE substantially exceeded Mr. Janacek's advice in

using ReThink for more than just "tools," and that its employees attempted to conceal the use of

---

[15] The advice of counsel defense is still available "even if that advice turns out to be false." *Newport News Shipbuilding, Inc.*, 276 F.Supp.2d at 565; *see also United States v. Stevens,* 771 F.Supp.2d 556, 567-68 (D. Md. 2011) (explaining that, pursuant to the model jury instructions, if all the elements of an advice of counsel defense are met *"a defendant cannot be convicted of a crime which involves willful and unlawful intent, even if such advice were an inaccurate construction of the law"*) (quoting 1 Sand *et al.*, Modern Federal Jury Instructions-Criminal ¶ 8.04 Instr. 8–4 (emphasis supplied in original)).

ReThink. Further, the disclosure of Mr. Janecek's advice on ReThink carried with it a cognizable

risk that all of Mr. Janecek's e-mails could have been the subject of a compelled disclosure,

thereby making things worse for GCE. Under these facts, SEF cannot be held liable for failing to

raise an advice of counsel defense.

   *B.   SEF's Advice on the Use of H1-B Labor.*

   Mr. Muslimani was aware of the issue of the use of H1-B Visa labor as early as February

2008, when he recognized the need for a contract waiver on H1-B labor. Def. Ex. UUU. Later,

when GCE sought SEF's advice on the issue, Mr. Janecek plainly advised GCE to seek contract

waivers from the appropriate contracting officers. Pl. Exs. I-2 ("If GCE wishes to use India

nationals on these contracts, it should get an express waiver of these provisions from the

contracting officers"), I-3 ("If GCE wishes to use these people on the DoL and EEOC contracts,

we recommend that GCE obtain the written concurrence of the contracting officers for these

contracts and a waiver or removal of the contract language.") GCE never sought any such

waivers. The Global Settlement Submission, which was approved by Mr. Muslimani (albeit

reluctantly) in advance of its submission to the government, admitted to extensive use of

unauthorized H1-B labor on these contracts. *See* Def. Ex. QQ, pp. 30, 41.

   GCE seeks to minimize its failure to seek any contract waivers by arguing that someone

at GCE "dropped the ball," and that the consequences for its failure to obtain waivers should

have been far less draconian than what ultimately happened, the forced sale of the company to

the government and the payment of a $9.0 million fine. Saying that someone dropped the ball,

however, is simply a way of downplaying GCE's responsibility here.

   Moreover, GCE's argument that H1-B violations "do not destroy companies" is just

unsupported by the evidence. The violations were very serious and were pursued aggressively by

the government. There is no logical justification for focusing solely on the ReThink India

violations on the SAM Task Order (where, as noted above, GCE's conduct went well beyond

Mr. Janacek's advice in any event), and ignoring the use of H1-B labor on the DoL and EEOC

contracts. The $9.0 million fine (agreed to by Mr. Muslimani and recommended to this Court for

approval as a reasonable settlement) was not allocated as between the ReThink violations and the

H1-B labor issues.

GCE did not follow SEF's advice with respect to the H1-B labor on the DoL and EEOC

contracts. It made no attempt to seek waivers from the contracting officers. SEF, therefore,

cannot be held liable for failing to raise an advice of counsel defense with respect to the H1-B

labor issue.

### III.     The Court Finds in Favor of the Defendant on the Issue of Causation.

The term "proximate cause" connotes "an act or omission that, in natural and continuous

sequence unbroken by a superseding cause, produces a particular event and without which that

event would not have occurred." *Joynes*, 677 S.E.2d at 264. It is worth noting at the outset on the

issue of causation that: (a) SEF did not advise GCE to file for bankruptcy; (b) SEF did not advise

GCE to sell its assets; and (c) SEF did not advise GCE to settle with the government and to pay a

$9.0 million civil fine. Further, no evidence was presented that the government would have

accepted less than a $9.0 million fine on its civil FCA claims.

The government was clearly focused on GCE's use of H1-B labor, almost from the outset

of the investigation. Ms. Kelly mentioned the DoL contract in the attorneys' first meeting in June

2013. Mr. Kendall's July 3rd summary of his discussion with Ms. Kelly indicates that the

government was focusing on "(1) proper clearances; (2) work done by U.S. citizens; and (3)

work done either at Reston or at a facility designated by GSA." Def. Ex. CC. These are

references to the use of H1-B labor. Mr. Coburn minimizes the importance of GCE's contract

violations in using H1-B labor on the DoL and EEOC contracts, but there is no factual basis to

suggest that these violations were unimportant to the government. To the contrary, they were an

integral part of the settlement reached with the government and the $9.0 million fine was not

allocated to any particular violations on any of the contracts at issue.

Moreover, while the availability of the advice of counsel defense could have mitigated

(or even eliminated) the specific intent element, or *mens rea*, as well as the knowledge element

under the civil FCA, GCE could not have established the defense on the civil FCA violations for

the reasons explained above. *See* 18 U.S.C. § 287; 31 U.S.C. § 3729; *Newport News*

*Shipbuilding, Inc.*, 276 F.Supp.2d at 565 (explaining in a civil FCA prosecution, "good faith

reliance on the advice of counsel may contradict any suggestion that a contractor 'knowingly'

submitted a false claim, or did so with deliberate ignorance or reckless disregard"); *see also*

*United States ex. Rel. Drakeford v. Toumey,* 792 F.3d 364, 381 (4th Cir. 2015). Specifically, the

elements of the advice of counsel defense are essentially the same despite the fact that proving a

civil FCA violation does not require a showing of specific intent. *Harrison v. Westinghouse*

*Savannah River Co.*, 176 F.3d 776 (4th Cir. 1999); *supra* fn. 9 ("[T]he [civil] FCA requires "no

proof of specific intent to defraud," citing 31 U.S.C. § 3729(b)(1)(B)."). Thus, to successfully

assert the advice of counsel defense in a civil case, just as in a criminal case, GCE would need to

"show (i) full disclosure of all pertinent facts to an expert, and (ii) good faith reliance on the

expert's advice." *Newport News Shipbuilding, Inc.*, 276 F.Supp.2d at 565. However, as pointed

out in *Newport News* "evidence of reliance on the advice of counsel and outside experts does not

necessarily bar a fact-finder from finding that the contractor acted with reckless disregard; the

contractor might have acted recklessly in relying on the advice because, for example, . . . the

41

contractors' compliance with that advice was recklessly incomplete." *Id*. Therefore, GCE cannot demonstrate that SEF caused GCE's demise by failing to assert the advice of counsel defense when, as described above, GCE greatly exceeded the advice with respect to ReThink and did not follow SEF's advice on the H1-B issue.

GCE and its officers and employees, had a *perfect* result on the criminal side – no indictments, no trials, no convictions. SEF cannot possibly be held liable on the criminal side. On the civil side of the government's FCA claims, GCE settled with the advice of its new counsel because it had civil exposure both for the ReThink violations and for the H1-B violations. The government demanded $20.0 million. GCE offered something less than $1.0 million. The parties settled for $9.0 million.

In the end, the Court finds that GCE sold its assets and paid a $9.0 million civil fine to the government because it had substantial exposure (including treble damages under the FCA, 31 U.S.C. § 3729(a)(1)) arising from its contract violations on both the SAM Task Order and the DoL and the EEOC contracts. SEF cannot be held liable for these violations.

## Conclusion

For the foregoing reasons, the Court finds in favor of the Defendant on Count III (Legal Malpractice). As Count III is the last Count remaining in the Plaintiff's Second Amended Complaint, a separate Order will be entered dismissing the Second Amended Complaint.

Date: Aug 15 2017

Alexandria, Virginia

/s/ Brian F. Kenney

Brian F. Kenney
United States Bankruptcy Judge

Entered on Docket: August 15, 2017

<u>Copies to</u>:

David I. Swan, Esquire
McGuireWoods LLP
1750 Tysons Boulevard, Suite 1800
Tysons Corner, VA 22102-4215
*Counsel for Global Computer Enterprises, Inc.*
*as Debtor and Debtor-in-Possession*

Christopher Hoge, Esquire *(pro hac vice)*
Elena Iuga, Esquire
Crowley, Hoge & Fein, P.C.
1730 Rhode Island Avenue, Suite 1015
Washington, D.C. 20036-3215
*Counsel for Global Computer Enterprises, Inc.*

Eric Patrick Burns, Esquire
Robert Bruce Wallace, Esquire
Wilson Elser Moskowitz Edelman & Dicker
8444 Westpark Drive, Suite 510
McLean, VA 22102
*Counsel for Steese, Evans, & Frankel, P.C.*

Craig M. LaChance, Esquire
Frankel PLLC
1707 L St. N.W., Suite 500
Washington, DC 20036
*Counsel for Steese, Evans, & Frankel, P.C.*